[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an action which commenced on October 26, 1995 in the Superior Court for Juvenile Matters in Plainville, Connecticut by petition alleging neglect and abuse in the matter of Dillon P. (D.N. 95-419). That petition was subsequently supplemented by a petition for termination of parental rights alleging that the child Dillon P. has been denied by reasons of act of commission or omission by the mother and father the care, guidance or control necessary for his physical, educational, moral and emotional well being, in that Dillon had been physically abused. Based upon the allegations of physical abuse with respect to Dillon, the Department of Children and Families (DCF) has also petitioned to have Dillon's siblings Tyler and Stephanie removed from the home.
The matter was transferred from the Superior Court for Juvenile Matters at Plainville to the Child Protection Session of the Superior Court for Juvenile Matters at Middletown for trial. The trial commenced on September 16, 1996 and the court heard nine days of testimony from 21 witnesses including the minor child, Dillon, and received into evidence 38 exhibits. The court has carefully considered all of the testimony and the evidence and makes the following findings of fact.
Findings of Fact
On April 16, 1992, Shawn P., the female biological parent of Dillon, and Martin P., the mother's then-boyfriend who is not biologically related to Dillon, brought Dillon to his pediatrician at Pediatric Associates of Bristol. Dillon was seven months of age at the time and was scheduled for a visit because CT Page 8136 of vomiting and diarrhea. During the visit Shawn indicated to the pediatrician, Dr. Hodder, that Dillon had fallen from a waterbed onto his head. The doctor noted no unusual complications from the fall and indicated to the mother that she should be watchful for complications from a head injury. Two days later on Saturday, swelling had increased and the child seemed lethargic. He was taken to the emergency room where an X-ray was taken and the family was referred back to the child's pediatrician, Dr. Hodder. On Tuesday, April 21, Dr. Hodder learned that the X-ray had revealed a skull fracture. He summoned the mother and child back. On Thursday, April 23, the child came back for the examination.
On Friday, April 24, 1992, Shawn indicated that she and her boyfriend Marty were preparing to go out and were in the shower together. They had placed Dillon on the floor of the living room and placed a gate at the door to prevent Dillon from leaving the room. After their shower Shawn noticed that Dillon had injured his face. Shawn and Marty took Dillon to the emergency room. At the emergency room the treating physician noted that the child had severe and significant evidence of multiple trauma; an inch of abrasion and petechiae; significant and unusual injury over the tip of the nose and over the skin; the lower lip and chin were bleeding; there were nineteen small bruises. The injury was consistent with the child having been thrown. The history given at the emergency room did not in any way satisfactorily explain the injuries. Both the police and DCF were notified. Dr Hodder filled out the mandatory report regarding suspected child abuse. Regrettably, Dillon was pre-verbal and not able to explain how he received his injuries. It was suspected that the injuries were caused by Martin, mother's boyfriend. The child Dillon was not released to his mother but rather to the male biological parent, Ernest V.P.
Ernest immediately sought temporary custody through the Bristol Probate Court. He was granted custody four days later on April 28, 1992. Ernest is the male biological parent of Dillon but he had never married Shawn. Ernest, unable to provide day care for Dillon, placed his son in the care of his paternal aunt and his grandfather.
Six weeks after Dillon was removed from Shawn's care, Shawn married Martin on June 5, 1992.
Eight weeks after securing custody, Ernest voluntarily relinquished and transferred temporary custody of Dillon to Linda CT Page 8137 B., the maternal grandmother. Dillon remained with the maternal grandmother for approximately six months. In December 1992, Shawn, the biological mother, petitioned the probate court to revoke temporary custody and return custody to her. The DCF supervisor suggested to the probate court judge that the matter be transferred to the Superior Court for Juvenile Matters. The probate court declined the invitation to transfer the case to the Superior Court. Notwithstanding an unfavorable social study by DCF, the probate court returned guardianship of Dillon to his mother and her new husband Martin.
On December 14, 1993, one year later, Ernest P., the male biological parent of Dillon, signed a voluntary consent form to have his parental rights terminated. On December 16, 1993, the Bristol Probate Court requested DCF to complete a study to investigate the issue of a possible step-parent adoption of Dillon. The social study concluded that Dillon's best interest would be better served by not granting the voluntary termination of parental rights of Ernest and by not granting an adoption of Dillon by Martin P. Notwithstanding the recommendation against granting the adoption, the probate court did grant adoption of Dillon by Martin P.
On October 23, 1995, the Department of Children and Families received a referral from Dillon's Head Start Program. Bruce Wrobel, an investigator for DCF, went to the Head Start Program to investigate the referral. Subsequently, two Bristol Police Officers became involved in the investigation.
Dillon was four years old at this time. He was brought to the emergency room of the Bristol Hospital. The attending emergency room physician was Dr. Mark Wipfler, who testified at the trial. The records of the hospital indicate the following:
 This four year old male presented to the Emergency Department, brought here by a DCF caseworker named Bruce Wrobel. Dillon reportedly had verbalized some worrisome comments to adults at school and was brought to the emergency department for evaluation of possible physical abuse. The child volunteered a lot of information without any prying. I asked him what happened to his face when I noted his scratch, and the child stated that, "My daddy hit me with a towel." I said, "Is there anything else?" and Dillon stated that his father scratched his finger with his fingernail and bumped his head on the ceiling. Dillon also CT Page 8138 said, "My daddy chokes me." He stated, "I don't like him to hurt me." He stated, "But my daddy gets mad, and he hurts me all the time." Dillon denied any pain at this time. He was quite calm and cooperative in the Emergency Department, although had poor eye contact, looked down at his hands during most of the interview and had very quiet speech. (Petitioner's Exhibit 13)
According to Mr. Wrobel's investigation, which began on October 23, 1995 at the Head Start Program, Dillon said that his daddy had hurt him; that his daddy hits him; that his daddy hits him with closed fists, gesturing striking his own head. He also indicated that his father choked him, demonstrating by putting his hands to his throat. The teachers indicated that they had seen bruises on Dillon before that day. Hector Lopez, a teacher at Head Start, indicated that when Dillon arrived that morning he reported that his father hit him and choked him. When Mr. Wrobel confronted Martin P. about these allegations, Martin indicated that Dillon was a liar.
On the following day when Mr. Wrobel saw Dillon again, Mr. Wrobel testified that Dillon ran up to him and grabbed him saying, "please don't let daddy hurt me any more." During the conversation Dillon also repeated that "daddy hits mommy." He said that "daddy hits him and that mommy doesn't help me." Based upon this information the DCF invoked a 96-hour hold and subsequently began the litigation which has brought this matter before this court.
FAMILY HISTORY
Shawn P.
Shawn has indicated to DCF that she was born on July 11, 1965 in Waterbury, Connecticut. She was the middle child amongst seven children. Three of her older siblings come from her father's prior marriage and her three younger siblings were the result of the marriage of Shawn's parents. She grew up in the Torrington area and graduated from high school. She reports no problems and a good relationship with her parents even though she reports that her parents were divorced when she was six and that both of her parents remarried.
Shawn indicates that she attended a local community college where she studied graphic arts, completing two and a half CT Page 8139 semesters, but never obtaining a certificate. In an unrelated program Shawn completed a home health course and received a certified nurse assistant certificate in 1986. She worked until 1989 when she gave birth on January 31, 1989 to her oldest child, Stephanie. Shawn recalls that she became pregnant with Stephanie during 1988 while dating two different men and that there is no acknowledged or putative father for Stephanie. After Stephanie was born Shawn went on Aid to Families with Dependent Children. In 1990 Shawn met Ernest P. through a mutual friend and subsequently they began living together and shared an apartment for approximately one year before Dillon was born on September 17, 1991. According to Shawn, Ernest was unstable in his employment and could not take care of himself. He had very poor personal hygiene, drank alcohol and was hard to talk to. Shawn indicates that she was often left with no food in the apartment or no transportation or means to pay the rent and she subsequently left him.
In January 1992, Shawn met Marty P. Dillon was four months old at the time. In April 1992, Dillon began to suffer inadequately explained injuries.
Martin P.
Martin P. was born on November 16, 1964, in Hartford, Connecticut. He is not aware of the identity of his birth parents and was adopted at age six months. Martin reports that he enjoyed a great childhood and remembers doing many things with his family. Martin reports growing up in Torrington, Connecticut and attending public schools until about the ninth grade when he dropped out of school. He has a twin brother who was adopted with him and has two younger adoptive sisters. The social studies indicate that Martin had a history of involvement with the Department of Children and Youth Services, he was oppositional and defiant of supervision in his youth, he ran away from his parents and admits to having a hot temper. The social study reports that Martin did not admit to having been hospitalized for psychological problems; however, he did indicate that he had some inpatient treatment for drug abuse.
 According to Mr. P., at age eighteen he began using drugs. He mentioned that he used cocaine, marijuana and alcohol. Mr. P. reported that he had purchased some cocaine which had instead been rat poison. After ingesting the poison, Mr. P. went on to detail, he became uncontrollable. He remembers his brother, CT Page 8140 Mark, smacking him in the head with a tire iron in an attempt to subdue him. This did not work, and the police, and an ambulance had been called to the scene. According to Mr. P., the only way that all of the individuals present, the police, his brother, EMTs, could possibly tame him was to allow Mr. P. to personally drive the ambulance to the hospital. Mr. P. stated that he stopped using drugs altogether after this incident. (Petitioner's Ex. 1, p. 6.)
After this episode Martin was arrested and was subsequently hospitalized for one month. The "step-parent adoption" study submitted to the Bristol Probate Court indicates that Martin has a history of arrests. The report indicates that on August 26, 1983, he pleaded guilty to burglary and received a sentence of three years probation and 500 hours of community service. In 1986 he was charged with larceny and on June 16, 1986, received a suspended sentence of six months with 18 months probation. "He was also concurrent for three months due to mischief and possession of drugs." (Petitioner's Ex. 4.)
In exhibits introduced by the respondent father (Ex. A) are two clippings from the Bristol Press. One, dated January 27, 1993, indicates that "Mark P., 28 and Martin P., 28 turned themselves in to police Tuesday to be served with warrants alleging they burglarized American Building Systems storage shed in October. The twin brothers were charged with burglary, larceny and conspiracy to commit burglary and larceny."
The second clipping dated May 10, 1993, reports as follows: "Martin P. 28 of High Street was arrested Friday night and charged with driving while intoxicated, misuse of marker plates, operating an unregistered and uninsured motor vehicle, and operating with a suspended license." Martin reported that he had to pay a $1,200 fine and spent two days in jail. On April 15, 1994, Shawn called DCF and indicated that her husband Martin no longer had a warrant for his arrest for failure to appear in court and that he now has a new court date of April 26, 1994. The disposition of that criminal charge is unknown.
Dr. David M. Mantell, a licensed clinical psychologist, was appointed by the court to do a psychological evaluation. That evaluation included a report (Petitioner's Ex. 27). In the interview with Martin, Dr. Mantell learned "the father reports having spent 43 days in Litchfield jail at the age of 20 on a CT Page 8141 motor vehicle charge. He said he had an accident and he hit a car in which the driver was fatally injured. He said he was subsequently arrested for acting up . . . . He said he was doing wheelies and that the lady in the other vehicle never saw him. . . . He explained he was on a motorcycle and on one wheel with his headlight up in the trees when he hit the other vehicle and that the lady didn't even see him coming."
Dr. Mantell describes Martin as an "intense, self involved, over reactive, verbally impulsive, angry, and mildly paranoid man who can appear verbally aggressive, explosive\blustery, but who was never so out-of-control that the evaluation had to be stopped . . . He is susceptible to rapid mood change, losing and regaining his composure frequently, and prone to many, hostile, self-defeating, and compromising verbal statements, reflecting pervasive anger, lack of insight, and at least reactive paranoia, through his self-declarations later make it clear that these problems are of a longstanding nature." During the interview with Dr. Mantell, Martin occasionally used very crude, vulgar expressions. Those expressions were the same words or similar to words described by social worker Felisa Boyd and Lisa Sedlock-Reider which Martin used outside the Bristol Probate Court at the time of a temporary custody hearing. Both social workers described Martin as highly agitated and angry calling Lisa a "f____ing bitch" and a "F____ing liar."
Dr. Mantell concludes as follows:
 Martin P. presents with personality disorder. This is apparently a persistent problem that has existed across many situations with features including both verbal and behavioral impulsivity, explosiveness, poor social judgment, substance abuse, and behavior which has caused injury/death to others. He acknowledges neglecting Dillon when the child was an infant, such that the child fell off the bed and recklessly using his motorcycle in a way that caused the death of a woman. Additionally, he has two DWI's, one fairly recently, in 1993. He can be quite self-serving in his statements. From an assessment standpoint, his in-interview behavior is self-defeating and provides a repeated documentation for the longstanding concern about his impulse control and judgment problems.
Dr. Barbara P. Berkowitz evaluated the extended family members and foster mother in February 1996 and in June 1996. The CT Page 8142 reports of Dr. Berkowitz lose some of their vitality because very little information was made available to Dr. Berkowitz. She was not permitted to see the social study, the complete medical information, including affidavits from the child abuse expert Dr. Betty Spivack, or the previous psychological evaluation done by Dr. David Mantell. Accordingly, Dr. Berkowitz was handicapped in fully understanding the nature and extent of the injuries to Dillon. According to Dr. Berkowitz, the parents did, to the best of their ability, control the flow of information and deny her a complete record.
Martin was diagnosed by Dr. Berkowitz as having an anti-social personality disorder. He brags about his arrests, his motor vehicle violations, his thefts, all as perfectly justifiable. One day he is seen as irritable, aggressive, grumpy, hostile and nasty; the next day charming, pleasant, etc. This is considered to be very volatile behavior. With respect to Dillon, he posits: A. he didn't do it; B. he doesn't have any feeling in his hands (and may have been too rough with Dillon); C. Stephanie caused the injuries (or the boy next door); D. Dillon fell off the bed.
However, Dr. Berkowitz does conclude as follows:
 In this psychologist's opinion, there is a strong probability that Mr. P. was responsible for Dillon's injuries and that the child's complaints are valid, whether the harm was caused accidentally or on purpose. Mr. P. has an extremely volatile temper, and does not always appear to be in good control of himself and his reactions. His judgment, at times, appears immature and his actions rough. There is too much to ignore or dismiss. In addition, as pointed out several times in the body of this report, it is extremely unlikely that only the [parents] are being truthful and accurate, and that everyone else is lying and conspiring. The strongest element missing for a good rehabilitative prognosis is some acknowledgment. on the part of Martin and Shawn P. of the actual circumstances of Dillon's injuries and complaints.
(Pet. Ex. 25; Emphasis in the original)
 PHYSICAL INJURIES
The first injury which came to the attention of medical authorities was on April 16, 1992. Dillon was seven months old. Shawn reported to the Bristol police (Petitioner's Ex. 2) that CT Page 8143 "the child had fallen off her [Shawn's] water bed." The child was subsequently X-rayed and a determination of a parietal skull fracture was made. The police report continues that
 Tonight (04-24-92), the mother returns to the Bristol ER with physical [sic] detected acute, multiple trauma to the face and bruises to the upper torso, anterior and posterior areas (chest and back regions). The mother immediately explains that the injuries to the facial region were caused by the child pushing himself forward with his feet causing him to fall either on the coarse rug or against the base of the couch and that the bruises were from the child's pacifier or the multiple toys found around the child, that the child sometimes lies on the toys causing imprints on his body. She stated that the child bruises easy as she does and some of her family members. The mother denied any blood disorders, stating that she was blood tested by her family M.D. for the blood disorders.
Dr. Delbert H. Hodder of Pediatric Associates of Bristol, Connecticut, the child's pediatrician, testified. Dr. Hodder indicated that given the skull fracture which had been diagnosed earlier in the week, and the evidence of multiple trauma to the child, that in his own mind he concluded that child abuse had occurred and was obligated to file a form 136 with the DCF. When Martin examined the medical records which indicated a suspicion of child abuse, he said to Dr. Hodder "if you want to know what f____ing abuse is, come outside and I'll show you!"
When Martin was describing this same episode to Dr. Mantell he indicated that after he, Martin, had found out that the child had a skull fracture, he returned to the pediatrician's office and yelled and screamed at him (Dr. Hodder) and pushed him around. Martin also explained to Dr. Mantell that the last time he had seen Dr. Hodder at his office "he had threatened to take the doctor's license and practice" and that is why Dr. Hodder made his own allegations and called DCF.
It should be further noted that after Dillon was discharged from the hospital following the second set of injuries, Dr. Hodder subsequently discovered that there were elevated blood chemistry readings regarding Dillon's liver, suggesting damage to the liver.
Dr. Betty Spivack, a recognized expert on child abuse, CT Page 8144 testified (see Petitioner's Ex. 20, curriculum vitae of Dr. Betty Spivack). She is an attending physician and child abuse consultant at the Children's Medical Center and an assistant professor of pediatrics at the University of Connecticut Health Center. She has written extensively in the areas of fatal child abuse and recognizing child abuse, and presently serves on the State Child Fatality Review Team.
Dr. Spivack indicated that three things come together in analyzing a possible child abuse situation. First is the injury itself. She indicated that injuries happened for reasons: "an evil fairy doesn't cause it." Second is the caretaker's report in which instance the investigator looks for matching the mechanism of the injury and the history given. The third component is the developmental stage of the child. Dr. Spivack analyzed the statistical likelihood of an injury which would produce the fracture of the skull in a seven-month old child. She indicated the likelihood of an injury occurring at various heights. She said it was highly unlikely that the child could have sustained such an injury from a fall from a water bed. In isolation she indicated it is possible, but very unlikely in a carpeted room. It would be less than one percent likely. In her considered medical opinion it is not at all likely that the fall occurred from a water bed. Dr. Spivack concluded that in her considered medical opinion the injuries sustained occurred as a result of child abuse. She further indicated that this injury to the head was a life threatening event.
Dr. Spivack next addressed the injuries which occurred a week later. On or about April 24, 1992, the child sustained an injury to the liver and she had the opportunity to review the records of Dr. Delbert Hodder and the reports from the Bristol Hospital Laboratory. She indicated that the chemical analysis showing an SGOT of 3518 and an SGPT of 1993 were very markedly elevated liver enzymes. Dr. Spivack indicated that in the context of child abuse the mortality rate for injuries to the liver is in the 25 to 50 percent range. This child sustained severe liver damage, which was Dillon's second life threatening injury within one week.
Dr. Spivack concluded that this was a "major force injury" which is a type of injury that can be caused by, for example, an object hitting the handlebar of a bike in an accident, a car crash or a fall from ten feet onto a rock. Dr. Spivack believed these are the kinds of mechanics which were required to cause a CT Page 8145 high force injury such as the liver injury Dillon sustained. In addition, she noted that the multiple bruising on the front and back of Dillon's body and a variety of patches on his trunk existing in clusters of bruises were in the same degree of healing, which suggests that they were all incurred at the same time. These bruises were one centimeter in diameter, which is the size of fingertips of most adults. There were at least nineteen such bruises. The mother's explanation that the child slept on his pacifier or rolled onto his toys were simply not plausible and made no sense to Dr. Spivack. "In 17 years I've never seen a bruising occurred by a pacifier." Dr. Spivack concluded after reviewing the medical records of the 1992 injuries that this child had been physically abused in a life threatening manner. Dr. Hodder concluded that the bruises to Dillon's face and body were consistent with a fall from a significant height. (Pet. Ex. 23.)
Dr. Mark Wipfler, assistant director of the Bristol Hospital emergency room, is board certified in emergency medicine. He is an assistant Clinical Instructor at the University of Connecticut Medical Center. He has practiced in Connecticut for five years. Previously, Dr. Wipfler worked in New York City where he saw many abused children and many suspicious injuries. He testified that on October 23, 1995 the child was brought in to the emergency room at the Bristol Hospital. His physical examination revealed lacerations to the face, and petechiae or lesions to the throat four or five centimeters in length along the front of the neck on the trachea. There was a gap, one finger wide, between the petechiae. The child indicated to Dr. Wipflir that his father had choked him. The injuries were, according to Dr. Wipfler, consistent with choking or manual strangulation. The injuries were considered to be life threatening.
On cross examination Dr. Wipfler testified that Dillon did not seem rehearsed nor did it seem that he had memorized the complaints. The mark on his face was consistent with a towel being snapped in his face and not consistent with a punch or scratch. It was a "funny looking triangle on his face, well delineated" and he was drawn to the injury for that reason. Dr. Wipfler suspected child abuse from the moment the child started narrating the cause of his injuries.
With respect to these 1995 injuries, Dr. Betty Spivack indicated that the records reflect the child was in stable condition and talking. The neck injuries were the most CT Page 8146 significant. Two lines of petechial hemorrhages on the neck are classic strangulation marks. They were not sustained by children playing with pillows. The marks were consistent with the child's explanation and not consistent with the parent's explanation. Dr. Spivack believes the injuries to Dillon were life threatening. She concluded her testimony indicating that Dillon had suffered skull, liver, and choking injuries, each of which was life threatening. She further stated that the child had been the victim of repetitive child abuse, the likely perpetrator was in the household, and the other parent had not only failed to separate from the perpetrator, but married him! Dr. Spivack stated unequivocally that returning this child to that household is setting the child up for fatal abuse. "All the red flags are there."
With respect to the dangers to the remaining children in the household, Dr. Spivack indicated that it is not unusual that there is one child singled out for special attention and is most likely to have the first fatal injury. Dr. Spivack indicated that she had reviewed the notes of Martin's conduct as described by a parent aide provided by DCF after the first injuries to Dillon. The notes indicated that Martin called thirteen-month-old Dillon a "wimp," and as not being a man because he was crying. She indicated that this is an extremely unrealistic expectation of a young infant. On one occasion in probate court, Martin was seen sticking pins into his own hand and saying it did not hurt. Whatever an adult's pain tolerance, Dr. Spivack said, it could not be projected to an infant. These kinds of expectations on the part of Martin toward a child were exceptionally worrisome to Dr. Spivack. She further indicated that once the child who has been the target of abuse has been definitely removed, the two children that remain become at greater risk. This is especially true for Tyler, who, being a male, and given Martin's notions of manhood, is especially at risk.
Under cross examination Dr. Spivack called the injuries in this case to be a classic description of battered child syndrome. She indicated that in the medical literature there is no evidence that this sort of constellation of significant abuse at a very early age will abate even where there has been intense counseling over six months to a year. She further stated that most children do not suffer even one life threatening event in their lifetime. This child has suffered three such events while Martin has been in the household: two in 1992 and one in 1995. CT Page 8147
As if there was an insufficiency of expert testimony, the petitioner called Dr. Wayne Carver, the Chief Medical Examiner for the state of Connecticut. In addition to investigating deaths, doing autopsies, and clinical consultations, the medical examiner evaluates injuries. Dr. Carver evaluated the medical records of Shawn. He noted that Dr. Hodder's records are of unusually good quality. With respect to Dillon's first injury, the parietal skull fracture, Dr. Carver said this was a blunt trauma injury which was life threatening and that the history given, i.e. falling from a waterbed, was not consistent with the severity of the injury.
With respect to the second injury in 1992 where the child had multiple bruises to the body, abrasions to the face and very significantly elevated enzymes, well beyond normal limits, suggesting damage to the liver, the best explanation for the child's injuries is child abuse, according to Dr. Carver.
With respect to the 1995 injuries to the neck, Dr. Carver indicated under cross-examination by Shawn's attorney, that the petechiae pattern on the neck is consistent with manual strangulation. The other injuries in 1995 to the child's face suggest that the child hit a flat surface. Dr. Carver's question was, how did the child get in motion? In summary, he testified that the massive injuries in the context of multiple injuries to other parts of the body suggest one conclusion: child abuse. He further stated that the severity of the injuries are not consistent with the history provided by the parents.
For their part, both Martin and Shawn dismiss the seriousness of the injuries, and the child is perceived as a liar. DCF, the Wheeler Clinic, the police, the State's Attorney, Dr. Hodder and others are perceived either as incompetent or in conspiracy against the parents. At no time do the parents acknowledge responsibility, except a modest statement that they may have been somewhat neglectful in supervising Dillon. Dr. Berkowitz indicated that Shawn has a borderline personality disorder. She is ego-syntonic, that is, she believes that she doesn't have a problem with her behavior; only other people have a problem. For her, the biggest stress of all this is from DCF, not from her problem. She wanted validation from the evaluator, Dr. Berkowitz, to establish "I'm O.K., they're all wrong."
The Child, Dillon.
CT Page 8148
Dillon was born on September 17, 1991. He suffered two of his life threatening injuries at seven months. He was removed from his mother's care and remained out of the home for seven months. He resided with his mother and adoptive father until his third set of injuries on October 26, 1995, when Dillon was age four. He has now been out of the mother's care again for approximately one year.
At the insistence of mother's counsel, the child was interviewed. After hearing from Dr. Berkowitz and Michelle Levine, Dillon's therapist at the Wheeler Clinic, the court established a protocol which was agreeable to all counsel. Pursuant to Practice Book § 1051.1(3), counsel submitted written questions. The list of questions was consolidated and reduced to a manageable number (see Court's Exhibit 1), considering the short attention span of a five year old. Other things the court considered were the child's understanding of truth and the difference between fantasy and reality. In this regard the court has further considered that there is nothing in the literature that suggests that children are more likely to lie than adults. The child's innocence could actually lead to the opposite conclusion.[1]
In testing fantasy and reality of the child witness in a case of child abuse, "it is difficult for the average person or juror to imagine that children have the capacity to fantasize . . . [because] . . . children do not have adequately developed intellectual capacity; therefore, the substance for their fantasies probably comes from real experiences. Some experts believe it is unlikely that these experiences would occur without the presence of (physical) . . . abuse. In addition, children generally fantasize about happy, pleasant experiences, not those in which they are injured or scared."[2]
All counsel, the court officer, and the judge, traveled to the Wheeler Clinic in Plainville, Connecticut on a regularly scheduled day for Dillon's therapy. That therapy occurs in a playroom with a one-way mirror, behind which counsel were able to observe the interview. The interview was videotaped and is marked as Court's Exhibit 2. Initially counsel had agreed that Dillon's therapist could ask the questions, but she declined to do so. However, she did agree to sit in on the interview and introduce the judge in a non-threatening familiar manner. Counsel then agreed that the judge should ask the questions. CT Page 8149
Dillon presented as a very handsome, small and very active child. He appeared to be in good health, and was clearly comfortable in the setting. Dillon clearly stated that his daddy hurt him in response to two or more questions about being hurt and why he is not living at home. The court finds Dillon's statements to the court and to others to be credible, truthful and consistent over time as they relate to Martin P. being the perpetrator of Dillon's injuries.
One more unfortunate aspect of this case is that Dillon does visit with his mother, knows who she is, probably loves her, and wants to return home to be reunited with his brother and sister. The reality is, according to Dr. Spivack, that the bonding with the mother may be sad, but with the abuser in the home, the risk to Dillon is death. Dillon's primary need is to be safe. A supreme tragedy is that Dillon was victimized by an abuser, and when he disclosed it, he was victimized again by his rescuers by being removed from his family, not the abuser. It is the task of this court to avoid further victimization.
A fortunate circumstance is that Dillon has stabilized in his present foster care home. He views the foster mother as "Mommy" and often tells her he loves her. He is noted by the foster mother to be very affectionate, bright and as becoming more secure in his setting.
ADJUDICATION
In this matter of Dillon, Tyler and Stephanie, the court finds that service has been made upon the respondents, that the respondents have been effectively represented by counsel and that no action is known to be pending in any other court affecting the custody of the children.
With respect to Dillon, the court finds by a fair preponderance of the evidence, as of the date of the petition, that Dillon has been neglected in that the child has been physically abused.
With respect to Stephanie and Tyler, the court finds by a fair preponderance of the evidence existing at the date of the petition, that these children have been neglected in that they have been permitted to live under conditions, circumstances or associations injurious to their well-being. CT Page 8150
With respect to the petition for termination of parental rights of Shawn and Martin, the court finds by clear and convincing evidence that Dillon has been denied, by reason of acts of commission by Martin and omission by Shawn, the care guidance or control necessary for his physical, educational, moral or emotional well-being. The court finds that these grounds have existed for more than one year with respect to the earliest abuse of Dillon. With respect to the abuse in October of 1995, the court finds from the totality of the circumstances that the one year requirement should be waived, the court having considered the best interest of the child, the nature of the abuse, and the facts presented by this case.
DISPOSITION
It is not sufficient to find that grounds for termination exist. The court must also determine, pursuant to § 17a-112
(d), if a termination of parental rights is in the best interests of the child. The court must make this finding by clear and convincing evidence. In re Romance M., 30 Conn. App. 839, 857-58
(1993), appeal dismissed, 229 Conn. 345 (1994). See also Practice Book § 1050.1(3).
1) The Department of Children and Families has offered appropriate and timely services for visitation, for psychiatric/individual counseling, for anger management treatment and counseling for Martin, and support services such as a parent aide, outpatient psychological evaluation by Dr. David Mantell and Dr. Barbara P. Berkowitz. Not wishing to be involved with DCF, and in anticipation of the expectation that the parents submit to counseling, they engaged their own therapist, Ellie Quinn. This therapist, licensed for one and a half years, made her first in-court appearance for testimony as a social worker. Ms. Quinn was satisfied that Shawn and Martin had made a full disclosure to her. She said they talked about the 1992 incident and "he admitted to having some poor parenting skills." She further indicated that they could not accept responsibility for something they did not do.
Dr. Mantell indicated that rehabilitation must be addressed in the context of the abuse that occurred and an acknowledgment of the harm that was done. "They deny that abuse occurred. The type of personality disorders that they have seems intractable. If there is no acknowledgment, I don't know how we can conceptualize a treatment program." CT Page 8151
2) The court finds that the Department of Children and Families has made reasonable efforts, given the situation and circumstances, to reunite the child with the family. In the case of severe physical abuse the department must act cautiously. In this matter, the department wanted Martin to undergo anger management and/or domestic violence counseling. He refused. Shawn understood that if the abuser was removed from the home, the likelihood of being reunited with Dillon would be greater. Dr. Berkowitz testified that Shawn is actively supporting her husband and cannot guarantee the safety of the child. The child is being invalidated when he is not believed. Dr. Berkowitz further indicated that she (Shawn) is unwilling to deal with her own fear of abandonment. "This fear is greater than her need to protect her children . . . the message is, `Your feelings and needs don't count and if you get injured nobody is going to help.'" Given the conduct and attitude of the parents, DCF was unable to return Dillon to the danger of fatal child abuse.
3) Regarding court orders, fulfillment of obligations, expectations and the like: the court finds that the court approved numerous requests for evaluations, visitation and the like. As far as is known, the parents complied with all court orders. Expectations which required anger management counseling were not complied with.
4) The child's feelings and emotional ties with the biological parent and foster parents were fully considered by the court. The child is bonded to his foster family. There is a parental-child bonding with the mother and conflict and dissatisfaction in the relationship with Martin in that Dillon still feels threatened by him. He continues to feel distressed and conflicted because of his residual attachment to mother, father and to his siblings. His feelings toward his mother and siblings must yield to a greater concern for his safety.
5) With respect to the age of the child, Dillon is five years of age (born September 17, 1991). This child requires stability in his life, a time to heal without the fear of greater uncertainty, and an affirmation by this court that he may have a permanent home. Leaving this child in legal "limbo" would hardly be in his best interest.
6) With respect to the efforts the parents have made to adjust their circumstances, conduct or conditions to make it in CT Page 8152 the best interest of the child to return to his home in the foreseeable future, the court finds that the parents are in active denial of the abuse that has occurred and have not demonstrated any willingness to meaningfully alter their prior conduct which has brought about the removal of the child from them. Shawn has clearly opted in favor of Martin. They are both unwilling to make the necessary concessions to counseling and therapy required to provide a safe home.
7) With respect to any barriers which may have reasonably or unreasonably been placed in the path of the parents to have a meaningful relationship with the child, the court finds that the Department of Children and Families has met its obligations to both parents by repeatedly offering a variety of services to them, including regular visitation to the mother and anger management counseling to the father as well as evaluations by two very capable evaluators. It was very difficult for services to be made available or to be accepted by the parents given the parents' denials and their overt hostility toward DCF.
The court concludes by clear and convincing evidence, that it would be in the best interest of Dillon to have the parental rights terminated so that he may be placed in a secure, safe and stable home through adoption or long term placement.
ORDER
Having considered the foregoing facts, it is found by clear and convincing evidence to be in the best interest of Dillon for the parental rights of his biological and adoptive parents Shawn and Martin be terminated so that he may be placed in adoption or other permanent planning be accomplished without further delay. It is therefore ordered that the parental rights of the mother Shawn P. are terminated and the parental rights of Martin P. be and they hereby are terminated. It is further ordered that the Commissioner of Children and Families be appointed the statutory parent for the purpose of placing the child forthwith in adoption and to report to this court in writing as to the progress toward that end no later than ninety days from the date of this judgment. If adoption has not been finalized within six months from the date of the judgment, the Commissioner is further ordered to submit a motion to review a plan for terminated child no later than that date to ensure compliance with federal law which mandates judicial review of every child in the guardianship of this state at least every eighteen months. CT Page 8153
With respect to the minor children Stephanie and Tyler, having found that they are neglected children, the court orders Protective Supervision for the statutory period of one year. The court is mindful of the findings of fact made in this case and the specific concerns of Dr. Spivack regarding the possibility of further abuse to another child now that Dillon has been removed. The court requests the Commissioner of the Department of Children and Families to exercise particular vigilance in the supervision of this case.
Foley, J.